NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0389n.06

Nos. 08-5486; 08-5490

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**May 28, 2009**

LEONARD GREEN, Clerk

AMERICA'S COLLECTIBLES NETWORK, INC.,       )
                                            )
        Plaintiff-Appellee, Cross-Appellant,   )        ON   APPEAL   FROM   THE
                                            )        UNITED   STATES   DISTRICT
            v.                              )        COURT FOR THE  EASTERN
                                            )        DISTRICT OF TENNESSEE
MIG  BROADCASTING  GROUP,  INC.,  and       )
GUENTER MARKSTEINER,                        )
                                            )
        Defendants-Appellants, Cross-Appellees.   )
                                            )

BEFORE:   NORRIS, COOK, and GRIFFIN, Circuit Judges.

        GRIFFIN, Circuit Judge.

        Defendants MIG Broadcasting Group, Inc. ("MIG") and its Chief Executive Officer, Guenter

Marksteiner ("Marksteiner"), appeal the district court's judgment entered in favor of plaintiff,

America's Collectibles Network, Inc. ("ACN"), following a two-day bench trial.  We affirm the

judgment in plaintiff's favor against defendant MIG, but reverse the judgment against Marksteiner.

We dismiss as moot the cross-appeal.

                                            I.

        Guenter Marksteiner is the President and CEO of MIG Broadcasting Group.[1]  MIG operates

WHDT-DT, a high-definition television station in West Palm Beach, Florida.   According to

defendants, WHDT-DT ("WHDT") was the first high-definition television station in the United

---

[1]Marksteiner owns 100% of Marksteiner USA, Inc., which in turn owns 100% of MIG.

States.  Marksteiner personally holds the Federal Communications Commission ("FCC") broadcast license for WHDT.

ACN is a Tennessee corporation with headquarters in Knox County, Tennessee.  ACN does business as the Jewelry Television Network ("JTV"), a home shopping network that sells jewelry and gemstones, among other things, on television.  ACN contracts with television stations across the United States to carry its JTV broadcast.

In 2002, ACN contacted MIG because it wanted WHDT to carry its JTV broadcast in the West Palm Beach market.  The parties executed an agreement, dated August 21, 2002 ("2002 Agreement") that paid MIG an hourly rate for its JTV air time.  The 2002 Agreement expired on September 1, 2003.

The 2002 Agreement was lucrative for both parties, despite MIG's initial skepticism regarding JTV's success in the West Palm Beach market.  The parties decided to renegotiate the 2002 Agreement mid-term, and they signed a new agreement on April 24, 2003 ("2003 Agreement").  The 2003 Agreement was made retroactive to April 1, 2003, and superseded the 2002 Agreement.

The 2003 Agreement contained a "non-cancelable clause," which specified that neither party could terminate the contract, unless it provided written notice of cancellation by certified mail within thirty days of the contract's yearly automatic renewal date, commencing  March 1, 2004.  On March 9, 2004, Marksteiner, who negotiated the 2002 and 2003 Agreements on MIG's behalf, e-mailed Andy Caldwell ("Caldwell") at ACN.  Caldwell managed ACN's affiliate contracts.  In his e-mail, Marksteiner requested that the parties renegotiate the 2003 Agreement to reflect the increased

cost of WHDT air time. Over the next week, the parties exchanged e-mails regarding new pricing for WHDT air time. On March 24, 2004, the parties signed a new agreement ("2004 Agreement").

Similar to the 2003 Agreement, the 2004 Agreement contained a "non-cancelable clause," providing that neither party could terminate the contract unless it gave written notice at least thirty days prior to the contract's automatic renewal date of April 1st. Unlike the 2003 Agreement, however, the 2004 Agreement contained a modified notice provision that was specifically negotiated by both parties. The new notice provision required either party to provide notice of termination "in writing, sent by certified mail or return receipt requested, hand delivery, or other delivery service that provides written delivery verification . . . ." In early 2005, neither MIG nor ACN sought to renegotiate the 2004 Agreement, and it automatically renewed on April 1, 2005, for an additional one-year term.

In January 2006, Patsy Harris ("Harris"), an ACN employee, e-mailed WHDT's station manager, Brian Content ("Content"), to complain that WHDT was not broadcasting JTV's signal in accordance with the 2004 Agreement. Harris requested a "preemption credit" from WHDT, namely, a credit on ACN's monthly bill for unrealized JTV air time on WHDT.

Marksteiner personally called Harris to discuss her e-mail and explained to her that MIG's agreement with ACN did not provide for preemption credits unless JTV sales dropped below $280,000. He also followed-up their telephone conversation with an e-mail on January 25, 2006, explaining in greater detail the payment schedule contained in the 2004 Agreement. Harris disagreed with Marksteiner's assertion that the $280,000 floor nullified any applicable preemption credit.

On January 30, 2006, Marksteiner sent an e-mail to Ms. Harris, which stated, in pertinent part:

> The ACN contract with WHDT is due to expire very shortly. In the past, the old contract has just been allowed to automatically renew even though it contained ambiguous holdover language. Since the preemption issue has not come up before, no one cared about it. Since it is being raised now, any renewal contract will have to contain new and appropriate language.
>
> The person in charge of affiliate agreements should contact me immediately to discuss the future relationship with WHDT.

Harris Bagley, ("Bagley") an ACN executive responsible for ACN's programing, informed Patsy Harris that he was not concerned about preemption credits "because ACN enjoyed its relationship with MIG." After discussing the issue with Bagley, Patsy Harris e-mailed the following communication to Marksteiner on January 31, 2006:

> Forget it. All I asked was that someone explains [sic] why additional preemptions had occurred that had not occurred before. I didn't get an answer so I suggested a credit. That gets peoples [sic] attention wherever you go. Burt Bagley will contact you regarding the contract. To the best of my knowledge both parties have had little to complain about in regards to the contract.

Burt Bagley ("Burt") is Harris Bagley's son. Burt, who was transitioning into Caldwell's position and therefore responsible for the MIG contract, asked his father to handle the MIG negotiations because of the importance of the ACN/MIG relationship. Harris Bagley agreed. However, he did not follow up with Marksteiner because he saw no need to discuss preemption credits.

On February 3, 2006, Marksteiner sent an internal e-mail to Roane Cross ("Cross"), an accountant and director at MIG, stating that he had not heard from Bagley. According to

Marksteiner, he was ready to work on a new contract and e-mailed Cross because he wanted her to be involved with the renegotiations.

It is undisputed that between January 30, 2006, and March 9, 2006, MIG did not provide written notice to ACN stating an intent to terminate the 2004 Agreement. On March 9, 2006, less than thirty days before the scheduled automatic renewal date of the 2004 Agreement, Marksteiner sent Caldwell the following e-mail outlining his proposed changes:

> [T]he annual contract with MIG for airtime in the West Palm Beach, Florida market is due to expire this month . . . . At this time, MIG desires that any renewal contract be simplified to operate on a commission-only basis.

> The complex terms and procedures contained in the Affiliation Agreement have become burdensome and need to be replaced by a completely redrafted agreement based on a straight sales commission computed from JTV net sales.

Caldwell forwarded Marksteiner's e-mail to Bagley. Bagley, after conducting internal JTV sales research, responded to Marksteiner via e-mail on March 13, 2006, stating:

> When I passed on your March 9, 2006 email to our attorney to discuss changes in the agreement, he pointed out that the agreement has already extended for an additional one year term and is non-cancelable. Regardless, without waiving the contract, I am available to discuss possible changes with you . . . .

In March 2006, the parties exchanged various e-mails with drafts of new contracts and revisions, as well as comments about those drafts. According to Marksteiner, he and Cross were "working aggressively" to have the new contract finalized by March 31, 2006, so that the parties would not be operating without a contract. By March 31, however, the parties had not agreed upon a new contract, and MIG continued to broadcast JTV on WHDT. Likewise, ACN continued to make payments to MIG in accordance with the 2004 Agreement.

On May 9, 2006, Bagley e-mailed Marksteiner stating that he made changes to the proposed contract to accommodate MIG's concerns and that ACN's attorney was reviewing the draft agreement. According to Bagley, ACN was involved with three other matters that either consumed the time of its top executives or needed to be resolved before the MIG deal was finalized.

On May 17, 2006, Marksteiner sent an e-mail to Bagley indicating that "it is time for some movement on the new contract." In response, Bagley e-mailed Marksteiner stating: "I am trying . . . I promise . . . . Harris."

On May 19, 2006, Marksteiner e-mailed Bagley and listed the subject line as "WHDT-URGENT." In his e-mail, Marksteiner attached JTV's April 2006 sales report indicating a merchandise return rate of 50 percent, which he characterized as "intolerable." According to Marksteiner, the hefty return rate was disconcerting because MIG's commission was directly tied to it and WHDT's reputation was linked to the quality of goods sold on the station.

At 5:00 p.m. on Friday, June 30, 2006, after JTV had finished its programming for the month, MIG ceased broadcasting the Jewelry Television feed. Bagley learned of this development through JTV's Customer Service Department sometime over the weekend, on either July 1 or July 2, 2006.

On Monday, July 3, 2006, Marksteiner e-mailed Bagley a "Notification of Termination of Carriage" letter, dated June 30, 2006. In it, Marksteiner stated that "[i]n March of this year I timely notified you that the annual contract then in effect between JTV and MIG would expire on 31 March 06 and that MIG would not renew carriage of JTV programming under the terms of this agreement." Marksteiner also wrote that:

> MIG cannot indefinitely continue to carry JTV programming below prevailing rates and as of 1 July 2006, MIG shall terminate the JTV feed . . . . MIG is a commercial business and must make a profit through the sale of excess airtime of its managed stations. At this time, the lowest available rate offered during any daypart on WHDT Stuart-Miami is $200 per hour."

After MIG ceased carriage of the JTV feed, Bagley and Cross tried to renegotiate, but their negotiations were unsuccessful.

On July 6, 2006, ACN filed a Complaint in the United States District Court for the Eastern District of Tennessee seeking compensatory damages for MIG's alleged breach of the 2004 Agreement, as well as treble damages under Tenn. Code. Ann. § 47-50-109, asserting that Marksteiner procured MIG's breach in his individual capacity as an FCC licensee for WHDT. In March 2007, ACN filed a motion for partial summary judgment, which was denied. The district court held a bench trial on September 11 and 12, 2007.

On March 27, 2008, following extensive post-trial briefing, the district court entered judgment in favor of ACN on both claims, finding MIG liable to ACN for breaching the 2004 Agreement, awarding $434,692.86 in compensatory damages, and finding Marksteiner liable for procuring MIG's breach, awarding $869,385.72 in treble damages.[2] The district court apparently provided Marksteiner with an off-set credit of $434,692.86 to prevent a double-recovery for ACN.

Defendants appeal the district court's judgment against it for breaching the 2004 Agreement, arguing that Marksteiner's January 30, 2006, e-mail terminated the Agreement. Defendants also

---

[2]The order of judgment, however, awards ACN $456,396.81 in compensatory damages. The district court's calculation of ACN's damages appears in the district court's memorandum of decision, and we therefore rely on this amount as the proper figure.

assert that the district court erred in finding Marksteiner personally liable for procuring MIG's breach under Tenn. Code. Ann. § 47-50-109. ACN cross-appeals the district court's treble damages award, asserting that it erred by providing Marksteiner an off-set credit of $434,692.86.

## II.

When reviewing the findings of a district court following a bench trial, we apply a clearly erroneous standard of review to its findings of fact and a de novo standard of review to its conclusions of law. FED. R. CIV. P. 52(a)(6); *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985); *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005). "[M]ixed questions of law and fact are subject to de novo review . . . . However, the determination of any underlying facts . . . is subject to a clearly erroneous standard." *Sandler v. AII Acquisition Corp., Inc.*, 954 F.2d 382, 385 (6th Cir. 1992) (holding that waiver is a mixed question of law and fact). A finding of fact is clearly erroneous when "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 341 (6th Cir.1997). In addition, "[g]reat deference is demanded when the factual findings required the judge to make credibility determinations." *Per-Co, Ltd. v. Great Lakes Factors*, 299 F. App'x 559, 561 (6th Cir. 2008) (unpublished) (quoting *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 604 (6th Cir. 2005)).

## III.

The 2004 Agreement's automatic renewal clause provided: "[t]his Agreement will renew automatically for one-year terms unless either party terminates the Agreement in writing at least thirty (30) days prior to the end of any term."[3] The Agreement was "non-cancelable by either party."

Its notice provision required the following:

Any notices contemplated by this Agreement shall be in writing, sent by certified mail or return receipt requested, hand delivery, or other delivery service that provides written delivery verification and shall be deemed received the earlier of either two business days after mailing or when actually confirmed by written verification.

Its waiver clause provided:

No express or implied waiver of any default under this Agreement shall in any way be construed to be a waiver of any future or subsequent default of a waiver of any of the other rights of the parties under this Agreement, or a modification of any of said Terms or any extension or enlargement of the rights of the parties there under.

The January 30, 2006, e-mail, which defendants claim provided ACN with sufficient notice to terminate the Agreement, stated, in pertinent part:

The ACN contract with WHDT is due to expire very shortly. In the past, the old contract has just been allowed to automatically renew even though it contained ambiguous holdover language. Since the preemption issue has not come up before, no one cared about it. Since it is being raised now, any renewal contract will have to contain new and appropriate language.

The person in charge of affiliate agreements should contact me immediately to discuss the future relationship with WHDT.

A.

---

[3]Under its terms, the 2004 agreement automatically renewed on April 1, 2006, unless written notice of termination was provided by March 1, 2006.

Defendants assert that the January 30, 2006, e-mail satisfied the requirements of the 2004 Agreement's notice and termination procedures because the parties' "past business practices" waived ACN's right to demand strict adherence to the contract's terms. According to defendants, MIG and ACN "enter[ed] into new contracts and let old ones expire, without adhering to any of the formal notice of termination procedures required by contract." Specifically, defendants point to ACN's failure to object to Marksteiner's "late" March 9, 2004, e-mail during the parties' renegotiation of the 2003 Agreement. Under the 2003 contract, MIG was required to provide notice of termination by March 1, 2004. Based on this incident, MIG claims that ACN waived its right to require strict compliance with the 2004 Agreement's terms.

The district court ruled that MIG's January 30, 2006, e-mail did not terminate the parties' Agreement because the e-mail neither stated that MIG was exercising its right to terminate the contract nor complied with the contract's notice provision. We agree.

"[T]he search for the contracting parties' intent should focus on the four corners of the contract . . . ." *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999) (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)). Thus, a strong presumption arises under Tennessee law that ACN and MIG intended exactly what the 2004 Agreement provided – that a party wishing to terminate the contract must state that it was terminating the contract, must do so in writing at least thirty days prior to the end of the contract's term, and must deliver its notice of termination via certified mail, return receipt requested, hand delivery, or other delivery service that provided written delivery verification.

Defendants first rely upon *Oakland Press Co. v. NLRB.*, 606 F.2d 689 (6th Cir. 1979) to support their "past business practices" waiver argument, asserting that "[t]his circuit specifically recognizes the importance of past business practices in construing notice requirements." In *Oakland Press,* we affirmed the National Labor Relations Board's adoption of an Administrative Law Judge's finding that a letter sent by a union representative provided sufficient notice to terminate the parties' contract. 606 F.2d at 691. There, the renewal provision stated that the agreement would "continue in full force and effect from year to the year thereafter, unless written notice of desire to cancel or to terminate is served by either party upon the other at least sixty (60) days prior to the date of expiration." *Id.* at 690. Prior to the sixty-day deadline, a union representative sent a letter to the employer that included the following language:

> You are hereby notified that Newspaper Drivers and Handlers Local 37 . . . desires to continue its current collective bargaining agreement with your firm, but also to negotiate certain changes or revisions in its provisions, including those set forth in memorandum agreements and other supplements thereto to take effect during the contract period . . . .
>
> Local 372 offers to meet and confer with your representatives for the purpose of negotiating said changes or revisions at a mutually convenient date, time or place.
>
> The changes or revisions to be negotiated will be sent to you at a later date.

*Id.*

The employer rejected the union's letter, arguing that the agreement had renewed for an additional year because the union had not employed the specific language contained in the contract's termination clause. *Id.* The ALJ found that the above letter provided sufficient notice of termination because the union had sent an identical letter the year before, and the employer had treated it as

adequate notice of the union's desire to terminate the existing contract and renegotiate. *Id.* at 691.

We stated the following with respect to the ALJ's finding:

> The language of th[e] letter [from one year before] is virtually identical to language of the Union letters in the case now before us. It was considered to terminate the agreement of 1972. *The Law Judge considered that if that language terminated the contracts then, it was sufficient to terminate them now.*
>
> * * *
>
> We conclude that, while the record is susceptible to differing conclusions, substantial evidence on the record considered as a whole supports the findings of the Administrative Law Judge which were adopted by the Board.

*Id.* (internal quotation marks omitted) (emphasis added).

Although we affirmed the ALJ's decision, we did not specifically hold that "past business practices" are relevant when "construing notice provisions" or that our case law is "clear that such history is relevant." In addition, we did not decide *Oakland Press* under Tennessee law – we reviewed the ALJ's decision under a deferential "sufficiency of the evidence" standard. Finally, the present case is distinguishable from *Oakland Press* because the parties never previously deemed the contract terminated under similar language as the January 30, 2006, e-mail. For these reasons, *Oakland Press* is not dispositive of our inquiry.

ACN contends that we should reject defendants' "past business practices" argument because it is barred by the parol evidence rule. In sum, MIG's argument relies on conduct that occurred in March 2004, before the effective date of the 2004 Agreement. In addition, MIG specifically renegotiated the notice provision contained in the 2004 Agreement and did not insist on "e-mail" as an acceptable form of notice.

We agree with ACN. MIG's reliance on conduct that occurred before the parties executed

the 2004 Agreement is barred by the parol evidence rule. "The general rule is that parol evidence

is not admissible to contradict a written agreement, whether simple or by deed." *Clayton v. Haury*,

452 S.W.2d 865, 867 (Tenn. 1970). More specifically, "parol evidence cannot be admitted to

contradict or vary the terms or to enlarge or diminish the obligation of a written instrument or deed,

except on grounds of fraud, accident or mistake." *Id.* at 867-68. MIG's "past business practices"

argument would contradict or vary the terms of the 2004 Agreement (as opposed to aiding in its

interpretation), *see Burlison v. United States,* 533 F.3d 419, 430 (6th Cir. 2008), and MIG never

claimed that the notice provision was ambiguous. In addition, the 2004 Agreement contains an

integration clause providing that the "agreement constitute[d] the entire agreement between the

parties." Thus, any conversations and extrinsic agreements between MIG and ACN prior to or

contemporaneous with the execution of the 2004 Agreement are considered superseded or merged

into the contract. *Burlison*, 533 F.3d at 430. The Agreement's no-waiver clause also renders

defendants' argument unavailing.

Assuming arguendo that MIG's "past business practices" argument is not barred by the parol

evidence rule, MIG cannot successfully demonstrate waiver under Tennessee law. "[M]utual assent

. . . cannot be accomplished by . . . an ambiguous course of dealing between the two parties from

which differing inferences regarding continuation or modification of the original contract might

reasonably be drawn." *Cummins v. Opryland Prods.*, No. M1998-00934-COA-R3-CV, 2001 WL

219696, at *3 (Tenn. Ct. App. Mar. 7, 2001) (unpublished) (quoting *Jamestowne on Signal, Inc. v.*

- 13 -

*First Federal Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. App. Ct. 1990)). Tennessee law also requires credible evidence of mutual agreement to modify the contract's terms. *Gold Kist, Inc. v. Pillow*, 582 S.W.2d 77, 79 (Tenn. App. Ct. 1979) (waiver by conduct typically involves unequivocal evidence) (citing *Baird v. Fidelity-Phenix Fire Ins. Co.,* 162 S.W.2d 384, 389 (Tenn. 1942)). Here, the district court found that "there was no credible evidence" to support MIG's claim that the parties' 2002 and 2003 contract negotiations waived the termination and notice provisions contained in the 2004 Agreement. *See also Anderson*, 470 U.S. at 575-76 ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

## B.

Next, MIG argues that ACN had actual notice of its intention to terminate the 2004 Agreement, asserting that its January 30, 2006, e-mail plainly expressed MIG's desire to renegotiate. As a preliminary matter, this argument fails because the 2004 Agreement expressly identified the only acceptable forms of notice. In addition, we have previously held that a party's stated desire to renegotiate or terminate a contract provides insufficient notice of termination:

> In and of itself, the giving of a "notice of desire" obviously cannot change the terms of the contract. The experience of mankind from time immemorial has been that notice of desire is not inevitably tantamount to consummation of desire.

*Cincinnati Newspaper Guild, Local 9 v. Cincinnati Enquirer, Inc.,* 863 F.2d 439, 442 (6th Cir. 1988). Moreover, MIG's argument is flawed because it ignores ACN's ability to renegotiate the

agreement without waiving its rights. On March 13, 2006, Bagley responded to Marksteiner's

March 9 e-mail as follows:

> When I passed on your March 9, 2006 email to our attorney to discuss changes in the agreement, he pointed out that the agreement has already extended for an additional one year term and is non-cancelable. *Regardless, without waiving the contract, I am available to discuss possible changes with you . . . .*

(Emphasis added.)

Finally, the district court found:

> [N]either MIG nor ACN treated the January 30th e-mail as a notice of termination. Most certainly, there is no proof in this record that ACN ever considered the January 30th e-mail as a notice of termination. But even more importantly, MIG never considered the e-mail as a notice of termination. In his June 30, 2006, letter to Harris Bagley, Marksteiner stated that he gave "timely notifi[cation]" in *March*. Similarly, in his July 5, 2006, e-mail to Cross, headed "official letter of notice to [Jewelry Television]," Marksteiner made no mention whatsoever of the January 30th e-mail. Instead, from January 2006 through July 2006, MIG continued to invoice ACN "as per contract." And MIG continued to air the Jewelry Television feed, and ACN continued to pay MIG's invoices. In other words, after March 31, 2006, both parties conducted themselves as if the 2004 Agreement had in fact renewed.

For these reasons, we hold that the district court correctly ruled that the January 30, 2006 e-mail did not terminate the 2004 Agreement. We therefore affirm the district court's judgment against MIG for breaching the 2004 Agreement on June 30, 2006.[4]

## IV.

Next, Marksteiner appeals the judgment rendered against him pursuant to Tenn. Code. Ann. § 47-50-109.

---

[4]Defendants do not contest the materiality of MIG's breach or the district court's $434,692.86 compensatory damages award.

Tennessee Code. Ann. § 47-50-109 provides:

It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Under Tennessee law, a plaintiff's claim for procurement of breach "can be alleged successfully only when the interfering party is a third party not closely tied to the operations of the breaching corporation." *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.,* 33 S.W.3d 779, 782 (Tenn. 2000) (relying on *Forrester v. Stockstill*, 869 S.W.2d 328, 333-34 (Tenn. 1994) and holding that Tennessee courts recognize a privilege against tortious interference in contractual relationships "when there is unity of interest between the interfering party and the breaching party"). It is a basic principle under Tennessee law "that a party to a contract cannot be liable for tortious interference with that contract." *Cambio Health Solutions, LLC v. Reardon,* 213 S.W.3d 785, 789 (Tenn. 2006). "It follows that a corporate director, officer, or employee, if acting within the scope of [his] authority for the interests of the corporation, should not be held liable because [his] action is treated as that of the corporation." *Rennell v. Through the Green, Inc.*, No. M2006-01429-COA-R3-CV, 2008 WL 695874, *5 (Tenn. Ct. App. Mar. 14, 2008) (unpublished). As the Court of Appeals of Tennessee recently stated, "[w]e have not [yet] upheld any jury verdict or bench trial judgment that has held a corporate officer liable for breaching its own corporation's contract." *Id.* at *8.

The district court ruled that Marksteiner was liable for damages arising from MIG's breach because he "clearly intended to induce the breach of the 2004 Agreement when he instructed MIG to discontinue the Jewelry Television feed on June 30, 2006," basing its conclusion on "Marksteiner['s] admi[ssion] . . . that [he] sent the June 30th letter in his individual capacity." In its decision, the district court relied upon two documents in support of its ruling, specifically, Joint Trial Exhibits 3 and 5, as well as a portion of Marksteiner's deposition testimony, which contained the following colloquy:

Q. [*Attorney for Plaintiff*]: Let me make sure about the Exhibit 11 (same as Joint Exhibit 3).[5] Exhibit 11 is a letter from Gunter Marksteiner to ACN in his individual capacity.

A. [*Marksteiner*] That's correct, yes.

Q. Exhibit 11, you are not acting in any way as a shareholder, director, officer, employee, agent or representative in any way, shape, form or fashion of MIG Broadcast Group, Inc.?

A. That is correct.

Q. Okay. And in this letter as licensee of the television station you instructed MIG Broadcast Group to discontinue the feed of Jewelry Television at the end of June 30th, 2006?

A. That's correct, yes.

Q. And in instructing MIG Broadcast Group, Inc. to do that you were not acting as a shareholder, director, officer, employee or agent of MIG Broadcast Group, but were acting solely in your individual capacity as licensee?

---

[5]Joint Trial Exhibit 3 allegedly refers to a June 30, 2006, letter written by Marksteiner to ACN in his individual capacity as an FCC licensee. This letter, however, is not contained in the record and is not specifically discussed in the district court's decision.

A.     That's correct, yes.

Marksteiner asserts that in finding him liable for procuring MIG's breach, the district court confused two letters written by him on June 30, 2006. The first is Joint Trial Exhibit 5, a letter written by Marksteiner in his official capacity, solely as CEO of MIG broadcasting. This letter, signed by Marksteiner and addressed to ACN, was written on Marksteiner, Inc. and MIG corporate letterhead, and informed ACN that "as of 1 July 2006, MIG shall terminate the JTV feed . . . ." It explained that the decision was motivated by economic concerns, stating that MIG could not "indefinitely continue to carry JTV programming below prevailing rates . . . . [It] is a commercial business and must make a profit through the sale of excess airtime of its managed stations." Thus, if Joint Trial Exhibit 5 procured MIG's breach, as defendants contend, the breach was consummated by Marksteiner in his capacity as MIG's CEO acting on MIG's behalf, and he is entitled to assert privilege under *Waste Conversion Sys., Inc.,* and *Forrester.*[6]

According to the parties, Marksteiner wrote a second letter on the evening of June 30, 2006, after speaking with his FCC counsel in Washington, D.C. The district court's decision does not discuss this letter. Marksteiner testified, however, that he terminated the JTV feed "primarily" because of "the high level of return[ed] [] goods sold by Jewelry Television." According to his

---

[6]ACN argues that even if Marksteiner was acting as an officer of MIG at the time he procured the breach, he is nevertheless personally liable because he was not acting in the best interests of his corporation. *See Waste Conversion Sys., Inc.,* 33 S.W.3d at 783. ACN points to the underlying lawsuit and unfavorable judgment as evidence that Marksteiner acted contrary to MIG's interests. If this showing was sufficient, however, courts would need to look no further than the filing of a complaint to find that an officer was acting contrary to its corporation's best interests.

testimony, he was under a duty as FCC licensee to protect the public from substandard goods being sold over the WHDT broadcast.

ACN contends that Marksteiner deliberately invoked his status as an FCC licensee to breach the 2004 Agreement because he knew that he had no legal right to do so in his capacity as CEO of MIG. ACN argues that "Marksteiner knew full well that 'instructing' MIG to terminate the Jewelry Television feed would cause a breach because he, acting solely in his individual capacity, was *issuing an instruction to himself*, acting as MIG's President" to terminate the feed. (Emphasis added.)

This argument is too attenuated for us to accept. Under Tennessee law, ACN bears the burden to demonstrate that Marksteiner stood as a "third-party" to the contract at the time he procured the breach. *See Waste Conversion Sys., Inc.*, 33 S.W.3d at 782; *Forrester*, 869 S.W.2d at 333-34. When assessing Marksteiner's liability, we cannot overlook the "basic principle under Tennessee law that a party to a contract cannot be liable for tortious interference with that contract." *Reardon*, 213 S.W.3d at 789 (citations omitted).

To affirm the judgment against Marksteiner, we would have to conclude that he stood as a third party to the 2004 Agreement, a contract that he personally negotiated and signed on behalf of MIG, and that he was not closely tied to the operations of MIG as its President and CEO. *See Waste Conversion Sys., Inc.*, 33 S.W.3d at 782. Such conclusions are not supported by the record.

The cornerstone of the district court's finding of liability under § 47-50-109 was Marksteiner's own deposition statement that he sent the June 30, 2006, letter in his individual capacity. Even assuming the existence of Marksteiner's FCC letter, and its status as Joint Trial

Exhibit 3, Marksteiner's testimony constitutes opinion testimony by a lay person regarding a legal conclusion. In *Torres v. County of Oakland*, 758 F.2d 147 (6th Cir.1985), we stated:

> The problem with [lay witness] testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards . . . . This invade[s] the province of the court to determine the applicable law . . . .

*Id.* at 151. Marksteiner's lay testimony regarding his legal opinion of whether he was functioning in his official or individual capacity when he ordered the termination of the JTV feed is not dispositive. In this regard, Rule 32(d)(3)(a) of the Federal Rules of Civil Procedure provides:

> (3) To the Taking of the Deposition.
>
> (A) Objection to Competence, Relevance, or Materiality.
>
> An objection to a deponent's competence – or to the competence, relevance, or materiality of testimony – is not waived by a failure to make the objection before or during the deposition, unless the ground for it might have been corrected at that time.

*Id.*

Most important, even if Marksteiner was acting as an FCC licensee, under Tennessee law, a plaintiff's claim for procurement of breach "can be alleged successfully only when the interfering party is a third party *not closely tied to the operations of the breaching corporation*." *Waste Conversion Sys., Inc.,* 33 S.W.3d at 782 (emphasis added). The record belies this conclusion. Marksteiner was intimately connected with the day-to-day operations of MIG, as its President and CEO, and as the primary negotiator of the contract at issue in the present case.

For these reasons, we reverse the district court's judgment against Marksteiner because ACN failed to prove that Marksteiner was personally liable for procuring MIG's breach. Because we reverse the judgment against Marksteiner, we dismiss as moot ACN's cross-appeal.